UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- x

UNITED STATES OF AMERICA


                                     17 CR 533-10 (VEC)

           -against-

MICHAEL RIZZI,

                     Defendant.

--------------------------------------- x

**SENTENCING MEMORANDUM FOR
DEFENDANT MICHAEL RIZZI**

**SENTENCING ISSUES**

Defendant Michael Rizzi (Hereinafter "Michael" or "Rizzi") places before the Court the following issues relating to his appropriate sentence, pursuant to Fed. R. Crim. P. 32(c)(1).

On February 12, 2018, Rizzi pled guilty to Count One <u>only</u>, pursuant to a plea agreement, which charged conspiracy to commit bank fraud, in violation of Title 18 U.S.C. §1349.

In the Plea Agreement, the parties agreed that Rizzi's total offense level is 9 with a Criminal History category of III, and a Stipulated Guidelines range of 8 to 14 months. See PSR at ¶ 5; see *also* Plea Agreement at p. 3. Rizzi also agreed to provide restitution in the amount of $28,000.00.

1

At his sentencing, based on the arguments articulated in more detail below, pursuant to 18 U.S.C. § 3553(a) and a "missed opportunity," caused by the delay of prosecution by the New York City Police Department, Rizzi will respectfully ask the Court to sentence him to any sentence the Court deems fits so long as the sentence does not cause Rizzi to serve any additional time of detention to the nineteen month sentence federal sentence (15 months of imprisonment followed by four months of home detention) he is currently serving.

## A.    Presentence Report

### i. Comments

Defendant respectfully requests that the Court adopt the following findings, with slight corrections, and recommendations of the United States Probation Office listed in its PSR:

1.    ¶ 7:  The defendant is presently incarcerated at the MDC in Brooklyn, New York.  There are no records of disciplinary sanctions.

2.    ¶ 37:  That defendant is entitled to a 2 level reduction from his offense level for timely acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).

3.    ¶ 41:  Although Rizzi was originally charged as a "super agent" related to a Queens, New York gambling arrest he was allowed to plead guilty to the A misdemeanor of promoting gambling in the second degree since his actual involvement was

that of simple gambler.  Rizzi was sentenced to a conditional discharge which was indicative of his involvement.

4.    ¶ 42:  Along with fifteen months of incarceration, three years of supervised release and a $1,000.00 fine, related to Rizzi's sentence from May 4, 2017 under docket #16 cr 342-01 (CBA), the Honorable Judge Amon sentenced Rizzi to an *additional four months of home confinement* upon release from his present confinement.

5.    ¶¶ 51 and 73:  During the execution of a search warrant, related to Rizzi's 2016 Eastern District arrest, an unloaded and rusted 1932 Colt revolver was recovered in the basement of Rizzi's home.[1] Rizzi was arrested and charged by the state of New York.  Rizzi made each and every court appearance in said matter before he was detained on the instant matter.  The New York state prosecutors have failed to produce Rizzi to state court since August of 2017, on those charges. That matter is still pending in Kings County, New York State Supreme Court and will be the subject of a motion to dismiss, pursuant to speedy trial grounds, once he has completed his current incarceration.

6.    ¶ 108:  The probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range.

7.    ¶ 109:  The probation officer has not identified any factors that would warrant a variance from the applicable sentencing guideline range.

---

[1] Rizzi had not recalled that said "antique-looking" firearm, likely from the time he was a New York City Police Officer, was neither operational nor in his home at the time of its recovery on May 24, 2016.

[2] Both Rizzi and Mahady worked a number of years together, in the Ninth Precinct, while in the New York City Police Department.  During that time the

## B. 18 U.S.C. § 3553(a) Factors

While rendering the Sentencing Guidelines advisory, the Supreme Court has nevertheless preserved a role for them. *See Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 574 (2007). As explained in *Gall v. United States*, 552 U.S. 38, 49, 128 S. Ct. 586, 596 (2007), district courts must treat the guidelines as the "starting point and the initial benchmark[.]" *See also Rita v. United States*, 551 U.S. 338, 349-50 (2007). In the ordinary case, the Supreme Court has recognized that the Commission's recommendation of a sentencing range will "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350. The district court, on the other hand, has "greater familiarity with … the individual case and the individual defendant before him than the Commission or the appeals court." *Id.*, at 357, 358. The district court is therefore "in a superior position to find facts and judge their import under § 3553(a)" in each particular case. *Gall v. United States*, 128 S. Ct. at 597 (internal quotation marks omitted).

The Court considers whether the length of a sentence is substantively reasonable in light of the factors outlined in 18 U.S.C. § 3553(a). *United States v. Crosby*, 397 F.3d 103, 115 (2d Cir. 2005). For the following reasons, defendant submits

4

that a sentence below the guideline range is warranted based on the factors set out in 18 U.S.C. § 3553(a).

1.   The Nature and Circumstance of the Offense and
     the History and Characteristics of the Defendant

        Rizzi's personal and family histories are detailed in the PSR at ¶¶ 52-58, his mental and emotional conditions are discussed in ¶¶ 64-65, his substance abuse history is detailed in ¶¶ 66-67, and educational and employment histories are discussed at ¶¶ 68-73 of the PSR.

        Rizzi's history and characteristics have been adequately outlined in the PSR so we will not reiterate them all here.  We would like to take an opportunity to highlight some issues that we believe are relevant to the Court in fashioning an appropriate sentence.

        a.   Characteristics of the Defendant

        Rizzi is a 46 year-old citizen of the United States. He is a devoted father, husband and son.

     When I have spoken with Michael about his upcoming sentencing date he always talks about continuing to miss his kids grow up.  Especially during this most important time in their adolescent lives.  That said, Michael completely

understands and accepts that there is no one else to blame for him missing out on his kids' lives except himself.

Although Michael has greatly disappointed his family and friends they wholeheartedly express support for him, even knowing the situation that he placed himself in by participating in this Conspiracy to Commit Bank Fraud.

Since his arrest and detention, Michael has been humbled. As difficult as the detention has been he has used his current incarceration to learn about himself and to try to make himself a better person. To that end Michael has been successfully employed as the Head Orderly at the Metropolitan Detention Center where he is in charge of helping integrate the new detainees into life there. In the small amount of time that he has been detained Michael has made great strives to demonstrate to his loved ones, and more importantly to the Court, that he is doing what he can to make himself better.

Michael is not a hardened criminal. He is certainly not a dangerous or violent man and poses zero danger to the community. He is a man who, despite his mistakes and shortcomings, has expressed extraordinary acceptance of responsibility by pleading guilty early in this case as well as by personally speaking with his close family and friends to seek their understanding and forgiveness for his behaviors.

Rizzi was born in 1971 in Brooklyn, New York, to the marital union of James Rizzi and Anna Cacace.  He has one sibling, an older brother James Rizzi, Jr.  He has been married for the past fifteen years to his wife Jill and has two children, Brooke and Michael, Jr.  His family is aware and extremely supportive of him regarding his arrest and conviction.  Michael enjoys the love and support of his family.  He is a supportive father and wants to be present for the continued upbringing of his two children.  The past year while he has been detained has been especially difficult for Michael with respect to his children.

**_See Photographs attached as Exhibit A._**


The requirement that a court impose a "sufficient, but not greater than necessary" sentence to achieve those goals sets a limit on the sentence that a court may impose.  As the Second Circuit explained in _United States v. Dorvee_, 616 F.3d 174, 182 (2d Cir. 2010),

> [e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors. See [United States v.] Cavera, 550 F.3d [180,] 189 [(2d Cir. 2008) (en banc)].

Under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Micheal is now keenly aware of the seriousness of the crime to which he pled guilty. He recognizes that he is facing a lengthier period of supervision as well as a potential additional period of incarceration. Rizzi hopes that the Court does not sentence him to any additional time so that he go back to being a father in his children's lives. He also wants to focus on being gainfully and legally employed so that he may be able to financially assist his family. Michael also wants to ficus on his health when he is released.

An "individual assessment" of Michael takes into account his physical condition, prior good acts, and the impact any potential continued incarceration would have on his family. Submitted herewith are numerous letters of support that have been drafted to assist the Court. Hopefully, these materials will aid the Court in taking the measure of the man appearing for a sentencing that will have profound and lasting effects on him, his family, and his community even in the best of

circumstances.

**See *Letters of Family Members and Friends,* Attached as Exhibit B.**

Notwithstanding his conviction Michael is a man of good character.  His good character is evidenced in the numerous letters of support.  It is clear that his friends respect him tremendously for the kind and loyal person that he is.  They have used words like loyal, dependable, kind, etc.  They have recounted instances where Michael has been someone that they have relied upon, which speaks volumes to his character.  What is most important to note about these letters is that the writers acknowledge the fact that Michael has been charged with and has accepted responsibility for committing a crime.  I submit that his family members and friends still have faith and belief in Michael despite his conviction.  Their continued belief in Michael demonstrates the type of person that he is and the type of person they know he will continue to be.  I also expect that many of his friends and family members will be present in court when your Honor sentences him.

i.   <u>Mr. Rizzi's Physical Condition</u>

Rizzi is generally in good health, except for ongoing back issues related to an on the job injury when he was a New York City Police Officer.  This incident and injury ultimately ruined his promising law enforcement career.

Specifically, while a member of the NYPD, Rizzi was guarding a hospitalized prisoner at Coney Island Hospital in Brooklyn, New York.  The prisoner was a larger individual, and the police department had three officers guarding the prisoner during the night, but they left Rizzi guarding the prisoner on his own without any additional officers to assist him.  Rizzi had gone out of the prisoner's room to ask for the prisoner's medication, and the prisoner broke free and attempted to escape. Rizzi and the prisoner engaged in a four-minute fight, and the defendant attempted to subdue the prisoner by jumping on the prisoner's back.  The prisoner jumped up in the air and he landed on a metal cart with Rizzi on his back.

Following this incident, Rizzi suffered numbness in his legs and extreme pain in his back.  The defendant was sent for physical therapy and received cortisone shots, but he continued to experience the numbness and pain.  He then went to a neurosurgeon and learned that he had two discs touching his sciatic nerve.  In 1996 he underwent surgery at the Hospital for Special Surgery in New York, New York.  Rizzi awoke from the

surgery and the numbness was gone; however, he continued to experience pain in his back.

He currently experiences constant pain in his back. He received (before his current incarceration) weekly adjustments, which included heat and electronic stimulations from his chiropractor, Dr. Eric Workin in Staten Island, New York. Since his incarceration in August of 2017 Rizzi has been unable to receive said treatment. His current incarceration has made his back condition worse. Rizzi's concern is that his current incarceration has already caused permanent irreversible damage to his back since he has been unable to receive the proper care and treatment for it. He is genuinely concerned that if the Court sentences him to additional consecutive time, his prolonged incarceration may have a lasting irreversible detrimental effect on his back. Rizzi can unequivocally attest that his current incarceration has been unusually problematic and costly for him due to his medical condition.

During his back treatment he has been prescribed Ibuprofen, Naproxen, and Percocet for the pain. He tries so stay away from these medications because of their addictive effects and typically takes a simple Advil to treat the pain. Every single day during his incarceration in the maximum security jail that is MDC, he prays that he does become involved in a physical

altercation, one that he can not avoid, for fear that he will re-aggravate his back and spine injuries. As a former member of law enforcement he has to be extra vigilant of the People he associates with. We strongly believe that this incident and subsequent injury played a part in the downward spiral that brings him before the Court.

Michael therefore asks that the Court, as a factor in determining his sentence, to consider his health condition. See *United States v. Rioux*, 97 F.3d at 663 (2d Cir. 1996) (upholding district court's conclusion that, in combination, defendant's medical condition and charitable and civic good deeds warranted downward departure); *United States v. Martin*, 3363 F. 3d 24 (1st Cir. 2004) (appellate court affirmed departure where a defendant suffered Crohn's disease, noting that Crohn's disease, a malady of the small intestine, made defendant unusually susceptible to harm in prison because of risk of serious infection); *United States v. McFarlin*, 535 F.3d 808(8th Cir. 2008) (appellate court affirmed a departure for a serious heart condition and related problems); *United States v. Ghannam*, 899 F.2d 327 (4th Cir. 1990) (appellate court affirmed departure for debilitating effects of cancer); *United States v. Gee*, 226 F.3d 885 (7th Cir. 2000) (affirming departure where the district court reviewed medical record, watched deposition of defendant's cardiologist

and listened to in court testimony of both defendant and his
mental health therapist).


ii.  Prior Good Acts

The Guidelines provide that public service and "prior good
works," as well as military, civic, and charitable service, "are
not ordinarily relevant in determining whether a departure is
warranted."  See USSG 5H1.11.  Nonetheless, as with respect to
all such discouraged grounds, sentencing judges may properly
depart based on a defendant's public service and good works if
such circumstances are present to an exceptional degree.  See
*United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005)
(variance approved where defendant served in Marine Corps for
six years, was a volunteer firefighter for seven years, helped
deliver three babies, and acted as a Good Samaritan on three
distressful occasions in which others present were rendered
helpless); *United States v. Huber*, 462 F.3d 945 (8th Cir. 2006)
(affirming three level reduction where defendant had loaned
money to neighbor and fellow farmers in need, saving farms from
foreclosure and helped finance the start up and continuation of
businesses in local community); *United States v. Cooper*, 394
F.3d 172 (3d Cir. 2005) (downward departure affirmed for a

13

defendant who organized a youth football team in a depressed urban area, mentored the boys, and paid for one of the boys to go college; these were not detached acts of charity but hands-on personal sacrifices, which must have had a dramatic and positive impact on the lives of others); United States v. Serafini, 233 F.3d 758 (3d Cir. 2000) (affirming downward departure where defendant, a state legislator, had engaged in acts of personal kindness and good works that were "above and beyond" customary politics or charitable giving); *United States v. Woods*, 159 F.3d 1132 (8th Cir. 1998) (defendant paid for others to attend a private school, and both had graduated and become productive members of society); *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) (upholding departure based in part on defendant's long history of community service and his strong support in the community, even among family of the victim).

Here, the defendant submits that the strong support he has received from his community, and the substantial hands-on personal good works he has done, are a basis for sentencing him below the guideline range to zero months or at a minimum to a sentence within the guideline range to run concurrent to his current sentence. Michael's character letters are incredible by any stretch of the word. The letters detail an extraordinarily selfless individual who routinely puts the interests of others

before himself.  The letters are replete with anecdotes of the various writers' time spent with Michael where he has gone above and beyond to assist those in need.

In particular, I call the Court's attention to the letters of Enrico and Josephine Bruzzese for one of many examples.  The Bruzzese's refer the Court to the troubles of their 13 year-old daughter Julia who was diagnosed with a chronic case of Lyme disease in 2015 and had developed Guillain-Barre Syndrome, Postural Orthostatic Tachycardia, a severe autonomic dysfunction.  She "has been unable to walk and has been wheelchair bound since June, 2015."  The Bruzzese's write that:

> In October 2015, Michael and his wife, Jill, launched and promoted a GoFundMe page that raised a significant amount of money needed for my family to get by and support all of Julia's needs.
>
> Michael and his family have found a local charity and have arranged for large donations that help pay for Julia's medical expenses and expenses related to helping my family survive up until now.  This has kept my family from homelessness, while finding help for my daughter.  Additionally, through Michael's relentlessness, we have been able to spread awareness about the disease.  Michael and his family have come to our aid financially, logistically, and emotionally; they have lifted us from very difficult times on many occasions.

**See, Bruzzese letters, Exhibit B.**

Another example of Rizzi's prior good acts as mentioned throughout the letters is his compassion and care for the

15

wellbeing of a dear friend who succumbed to the disease of alcoholism in 2015. Several of the letters describe how Michael spent hours with this friend and devoted emotional and physical support to this friend, despite the fact that some of his own family had failed to remain by his side.

Finally, there are several letters that detail Rizzi's prior good acts to the community through his work as a New York City Police Officer. The final letter, a commendation from Commissioner Howard Safir states:

> The Integrity Review Board has informed me of your performance in our fight against corruption.
>
> Your actions speak very clearly of your commitment to the highest standards of professional conduct.
>
> Please be assured that your faithfulness to your oath of service has earned my appreciation in addition to that of the People of New York whom we serve. Thank you for acting in a way that brings credit and praise to the finest law enforcement agency in the world.

Other letters detail Rizzi's connection with the community through his role as a police officer and as a former police officer. For example, the letter from Paul Zito, who is a retired New York City Police Officer details Rizzi's dedication to protect and serve the people of New York City in his role as a police officer.

Your Honor, I am very aware that Micheal's role as a former police officer "cuts both ways" in his sentencing. On the one

hand I hope that the Court will take his nine-year former law enforcement career, into account, as a mitigating factor. However, I am also well aware that his position as a former New York City Police Officer can also be viewed as an aggravating factor.  While this is true and undeniable, it is our sincere belief that Rizzi's injury and subsequent forced retirement from the NYPD started the slow but serious downward spiral, which brings him before the Court today.  It is also my sincere belief that the year that Michael has spent in the MDC awaiting the resolution of this case has taught him life long lessons and he will not do anything going forward that would ever put him at risk of reoffending.

### iii. Impact on Mr. Rizzi's Family

The PSR and several of the letters in support detail the physical condition of Rizzi's elderly parents, the financial burden that incarceration has already placed on his immediate family which, would worsen with a longer sentence, and the writers' personal observations of the impact that the defendant has on certain members of his family.

The Court should consider the impact that any potential additional sentence of incarceration would have on Rizzi's family when deciding the appropriate sentence in this matter.

For example, the defendant's brother James, indicates:

> We have two sick elderly parents that Michael
> primarily takes care of.  My mother Anna is 83 years
> old and has been recently diagnosed with Chronic
> Lymphocytic Leukemia, an aggressive form of Leukemia.
> My father James is 86 years old was diagnosed with
> Bladder Cancer and has undergone chemotherapy and
> radiation treatments.  One week after the completion
> of my father's chemotherapy and radiation treatments,
> he slipped and fell and broke his hip and had to
> undergo hip surgery.  The reason I tell you this is
> because I want you to know the extent to which my
> brother Michael cares for our parents.  He takes them
> to their medical appointments, and oversees all their
> medicine and prescriptions daily and selflessly.
> Every child should take care of their parents, but I
> can tell you, this is a fulltime, with overtime,
> workload for both of us.  And as I work full time in
> Manhattan each day, Michael does the bulk of it.

**See, Letter of James Rizzi, Exhibit B.**

The defendant's wife further describes the following:

> Michael is a strong and honorable man who has admitted
> to making a less than honorable mistake.  This
> however, does not define the person he is.  Michael is
> a very honorable, dependable and caring man.  He is
> honorable in the father he is to his children, the
> husband he is to me, the son and brother he is to our
> families, the friend he is and the charitable man he
> is to the community.  We all depend on Michael in many
> different ways and he always does his best to do what
> he can to be there for us all.  The utmost important
> people in his life are our children. Together, we
> teach them to be respectful towards God, themselves
> and others and to be family-oriented young people by
> spending time together, such as at Mass, through
> charitable works & daily meals.  Through our actions &
> commitments, we do our best to teach them the value of
> family, friends and community.  Among other things,
> Michael volunteers his time to assist in coaching our
> son's football team whenever possible.  He is
> responsible for the care of both of his elderly &

ailing parents and helps to support me in the effort to care for mine as well.  I also have a brother who is mentally ill who often looks to Mike as someone who he can trust when experiencing episodes of delusion & paranoia.  Several times in the past, Mike has been the only one who was able to be calm & convince him to surrender himself to hospitalization.

On behalf of our entire family, I ask for leniency in his sentencing.  In his absence, I fear our children and I will suffer tremendously emotionally, psychologically & financially.  The loss of his daily presence coupled with the possibility of having to separate from their school friends due to the effects Mike's absence will have on our financial situation, will cause Brooke and Michael excessive & extreme pain and suffering.

**See, Letter of Jill Rizzi, Exhibit B.**

Most importantly, I turn the Court's attention to the letter written by Michael's mother Anna Rizzi on behalf of his parents, which offers a small view into the way in which Michael's current situation has affected his parents as well as their unwavering support for their son.

"Your Honor, my husband and I rely heavily upon our son for many tings.  He was our primary care giver before he left to serve his sentence.  It has been difficult for us in his absence."

"Michael shows great remorse, has changed his outlook and has only good intentions for his future with his wife and children.  In light of all of this, we ask you consider a ruling of time served when he comes before for sentencing."

**See, *Letter of Anna Rizzi*, Exhibit B.**

The defendant's family circumstances and ties are a factor justifying a non-guideline sentence. See e.g. *United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) ("the families of defendants are the intended beneficiaries of downward departure on the ground of extraordinary circumstances relating to family responsibilities"); *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (the potential for imprisonment to effect the destruction of an otherwise strong family unit can be a basis for a judge's discretionary departure from the range set forth in the guidelines); and *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (same).

Here, the intended beneficiaries are his two children, his wife, his elderly parents, and his wife's elderly parents and brother. Michael has been incarcerated since August of 2017, almost one full year. That time has been difficult for his family, as was expected. Sending Rizzi away for additional prison time would not only unnecessarily hurt these members of his family, who rely on his emotional support, but also undercut the financial well-being of his minor children.

Understanding and acknowledging the background of Rizzi is critical because such knowledge assists the Court in finding a sentence that is sufficient but not greater than necessary to reach the sentencing goals of Congress. Without such knowledge

regarding the factors that influenced a defendant towards the commission of the offense, the defendant is left to the mercy of mathematical formulas that arrive at terms of incarceration with zero empirical relationship to either punishment or the causes that brought the offender before the court for sentencing.  See *United States v. Diaz*, 1:11-cr-00821 (JG) 2013WL32243, at 4-11 (E.D.N.Y. Jan. 28, 2013).

Naturally, Rizzi's conduct calls into question whether he would avoid and remain free of future criminal conduct.  The past eleven months of being confined in the MDC (Michael had never been incarcerated before) has been the biggest deterrent to Michael reoffending.

Between 2012 and 2016 Michael was in a dark place.  He was having trouble at home and trouble financially. I mention this not to excuse his behavior.  However, the additional felonious conviction as well as the continued personal embarrassment, anxiety, and depression that he has already suffered, while being incarcerated at the MDC, has served as a meaningful period of time for penance and reflection in that regard.  The road to redemption for Michael will be long and filled with many challenges.  Recognition and early acceptance of responsibility, along with his positive adjustment during his pre-trial supervision (on the 2016 Eastern District case) and his

successful time at the MDC have been steps in that direction. *C.f. Skipper v. South Carolina*, 476 U.S. 1 (1986) (positive prison adjustment is a sentencing mitigation factor); and *Gall v. United States*, 552 U.S. 38 (2007) (court may consider post arrest conduct, along with other factors, to impose a sentence at variance with the Guidelines).

Michael and his family are devout Catholics. Although his family is supportive, the family is saddened, ashamed and in many respects angry with him for the crime he committed. That being said, because of their religious faith and because they know what a good man he is they have been figuratively and literally by his side throughout this ordeal. They have traveled to support him during his court appearances and I expect many of his family members to be in attendance when the Court sentences him.

His family cares for him because he is a good and decent human being. For example, throughout the letters provided on his behalf by his family and friends, he has been described in great terms. But most importantly he has been described as a human being. As humans we make mistakes. And we sometimes even make repeated mistakes. What is important is that we finally learn from our mistakes. I expect that Michael, especially having spent the last year at the MDC, has finally learned from

these mistakes and will lead a law-abiding life when he is released from prison.

### iv.  Employment History

As the PSR correctly reflects Michael has been working most of his adult life.  As mentioned briefly above, Michael was a New York City police officer for approximately nine years before he was forced to retire because of an on the job injury.  But for that incident, we firmly believe that Michael would have continued his successful career as a police officer and he would not have put himself in this position.

During the time that Michael has been incarcerated at the MDC, he has been gainfully employed.  More importantly, a review of his work history at the MDC demonstrates the type of worker that he is.  For example his "Work Performance Rating" for the period of his incarceration indicates that he has demonstrated "outstanding quality of work."  He has proven to be "hard working."  He is "eager to learn." His quantity of work is "outstanding" where he "drives self exceptionally hard all the time." He needs "little supervision" with a "good record of dependability an[d] promptness."  He "shows no hostility or resentment."  Instead he "tries to improve."  He has shown to be "helpful" and is "Friendly, congenial, helpful; others like to work with him."

**See *Work Performance Rating,* Attached as Exhibit C**

Putting aside his current situation Michael has demonstrated, for most of his life, that he can be a dedicated worker and a productive member of society.

**2.   The need for the sentence imposed**

> a.   to Reflect the Seriousness of the Offenses, Promote Respect for the Law, and Provide Just Punishment for the Offense.

There is no doubt that the Court has the discretion to impose a sentence, which will address the instant offense in the context of all the circumstances.  Given the detrimental effect incarceration is already inflicting on his family; and the effect incarceration can be having on his health, we respectfully submit that no more additional time of incarceration than what he is currently serving is needed in this case to satisfy the factors enumerated in the law.

> b.   To Afford Adequate Deterrence to Criminal Conduct

The instant prosecution, with its psychological and financial penalties to date, I expect will be a lasting deterrence to Michael.  The thought of losing his parents before

he is released and the thought of missing his kids grew up I suspect and expect has set him straight.

### c. To Protect the Public from Further Crimes of the Defendant

There is nothing in the instant offense or Michael's past that should concern the Court that Michael is a danger to society. As I have mentioned numerous times above, the past year that Michael has spent at the MDC has had a profound and lasting effect on his life. There is nothing that Michael would do that would risk keeping him away from his children again. There is nothing that he would do that would risk sending him back to the MDC or any other place like it again.

Sentencing Michael to an additional period of incarceration, above and beyond the year that he has already served, plus the four additional months of home confinement that he has still to serve, is not necessary to insure that the public is protected.

### d. to Provide the Defendant with the Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

Michael is a hard worker who already possesses the necessary skill set to support himself and his family.

25

Therefore, a period of incarceration would not be needed for Michael to receive vocational training or education.

## 3. The Kinds of Sentences Available

The instant offense, Title 18 U.S.C. §1349, has a maximum term of imprisonment of thirty years. Based on the plea agreement with a guideline offense level of nine, and a Criminal History category III, the applicable guideline range of imprisonment is eight to fourteen months. Since the applicable range falls within Zone B and is governed by §5G1.3(d) any other discharged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently or consecutive to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense. We firmly believe that no additional period of incarceration is warranted to satisfy the objectives outline in 3553(a) based on the above.

We also believe that the "missed opportunity" that was caused by the NYPD in delaying this prosecution calls for no additional period of incarceration.

      a.    Due to the NYPD's delay in prosecuting Rizzi any term of incarceration should be imposed concurrently to achieve a reasonable punishment pursuant to U.S.S.G. §5G1.3(d)

i. <u>Facts</u>

On May 25, 2016 Michael Rizzi was arrested in the Eastern District of New York, and charged under Docket# 16-Cr-342 (Hereinafter the "Eastern District Case"), pursuant to a long-term investigation, led by Detective Myles Mahady (Hereinafter "Mahady") of the New York City Police Department. From approximately 2012 until Rizzi's arrest, on May 25, 2016, Mahady investigated money-laundering activities in connection with an escort service owned and operated by Rizzi.[2]

Said investigation, into the escort service, also revealed that Rizzi had been involved in a fraudulent short sale of a property located at 79 Lafayette Avenue, Staten Island, New York (Hereinafter "Subject Property"). The Subject Property is located in the confines of the Eastern District of New York.

Therefore, either before the time of Rizzi's arrest or very soon thereafter, Mahady possessed sufficient information and evidence, which formed the basis of the instant matter; yet Rizzi did not get arrested on the Instant Matter until fifteen months later.

---

[2] Both Rizzi and Mahady worked a number of years together, in the Ninth Precinct, while in the New York City Police Department. During that time the two of them often worked the same hours and had an on-going "bad blood" relationship for four years.

For example, on July 20, 2016, Mahady received a letter from Wells Fargo's Financial Crimes Investigators outlining that that Well Fargo believed that Rizzi had been involved in a fraudulent short sale of the Subject Property. Said letter, addressed to Detective Myles Mahady, appears to be in response to Mahady's inquiries and suspicions that Rizzi was involved in said fraudulent sale that formed the basis of the instant matter.

**See *Wells Fargo letter*, dated July 20, 2016, Attached as Exhibit D**

However, instead of bringing the facts of the fraudulent short sale to the attention of Assistant United States Attorneys for the Eastern District, who was prosecuting Rizzi on the Eastern District case (and where the Subject Property was located), the NYPD led by Mahady, instead waited until Rizzi's Eastern District case was completely resolved.

For instance, Rizzi pled guilty on the Eastern District case on October 5, 2016, almost four months after he was arrested.

He was not sentenced until May 4, 2017, almost a year after he was arrested. He was sentenced by the Honorable Judge Carol Amon to fifteen months of incarceration followed by four months of home confinement and three years of post release supervision.

Judge Amon allowed Rizzi to self-surrender on August 1, 2017, which he did without incident, to the low security detention facility at FCI Loretto.

During the entire time that Rizzi was being prosecuted on the Eastern District case he was out on bail, living in Brooklyn New York, and reporting to his pretrial services officer on a regular basis. During the entire time that Rizzi was out on bail on the Eastern District case he was not arrested by the NYPD for the instant matter even though the NYPD were well aware of where Rizzi lived since he remained at the same home where he was arrested on May 25, 2016.

Instead, immediately after surrendering at FCI Loretto, in Pennsylvania, Rizzi was sent back to the MDC. On August 7, 2017, after being processed and transported for approximately five to six days, Rizzi was subsequently returned to the Southern District of New York and formally arrested on August 7, 2017 on the instant matter.

As outlined in detail below, the delay in prosecuting Rizzi caused him to miss opportunities that prejudiced him on the instant matter.

ii.  Legal Standard

The issue of whether a Court is justified in considering whether a defendant should be sentenced to a lesser sentence or whether time should be imposed concurrently to an undischarged period of time, because of a "missed opportunity" due to a delay in prosecution, has been considered by different Circuits, but is not necessarily well-settled.

For example, in *U.S. v. Los Santos*, 283 F.3d 422 (2002) the United State Court of Appeals, Second Circuit, considered whether the District Court appropriately departed from the Sentencing Guidelines to account for a criminal defendant's "loss of opportunity" to serve concurrent sentences for both his federal and state crimes due to the government's apparent delay in instituting prosecution.

In *Los Santos*, supra, on December 6, 1999, during a routine check of inmates in a New York state correctional facility, the Immigration and Naturalization Service discovered that the defendant had been illegally present in the country after he had been deported. When Los Santos was released from state prison on March 21, 2000 he was taken into custody by federal authorities. Los Santos was subsequently indicted on April 6, 2000 and pled guilty in July of 2000. At his sentencing the defendant successfully argued that the District Court should have departed from the Guideline range in order to take into

consideration the time the defendant believed he would have been credited for the federal authorities taken him into custody in December of 1999 instead of delaying the prosecution until April 6, 2000. The District Court credited Los Santos with not only the four months between the discovery of the crime and the prosecution, but instead credited the defendant with the entire fourteen-month period of incarceration on the state case. The government appealed.

The Second Circuit in *Los Santos*, supra, ruled that "in order for the district court to depart under section 5k2.0 based on a prosecutorial delay that resulted in a missed opportunity for concurrent sentencing, the delay must either have been in bad faith or have been longer than a reasonable amount of time for the government to have diligently investigated the crime involved such that the delay takes the case out of the heartland." *Los Santos, 283 F.3d at 429.*

The Court in *Los Santos,* in citing cases from the Ninth and First Circuits, as well as policy concerns ruled that there needs to be a showing by the defendant of "bad faith" or "bad motive" for the delay on the part of the government in order for there to be a consideration of a departure.

That said although the Court in *Los Santos* vacated and remanded for sentence because it believe that a four month delay

seemed reasonable under the circumstances, the Court did acknowledge that the "fortuitous timing raises an eyebrow" and that waiting until the very last day that Los Santos was to be released from state prison "raises the suspicion of bad motive on the part of the government."

The Court further acknowledged that these cases are difficult because "a rule requiring the defendant to show bad faith on the government's part would nearly always prove to be an insurmountable burden for the defendant, even in a case where the delay is extreme." *Los Santos* at 428.

Another circuit that has addressed this issue with a less stringent requirement of a showing of bad faith is the Ninth Circuit in the case of *U.S. v. Sanchez-Rodriguez*, 161 F.3d 556. There the Court ruled that a defendant would have been entitled to concurrent time had the government not delayed his prosecution seven months after learning of his illegal presence in the country. In *Sanchez-Rodriguez* there was no allegation of bad faith on the part of the government. The Court ruled that the simple arbitrary delay, whether based on bad faith or not, which caused a harsher sentence was an instance where the Court could depart from the guideline range.

See also *U.S. v. Martinez 77 F.3d 332* (9th Cir. 1996) where departure from the Sentencing Guidelines can be warranted simply

from a delay whether the government had a sinister motive or not. The Court ruled that where a harsher sentenced was imposed from a delay since offenses could not be grouped together it is therefore a mitigating circumstance that is not taken into consideration by the Guidelines.

Finally in *U.S. v. Saldana*, 109 F.3d 100 (1997), a case similar to *Los Santos,* the First Circuit agreed that "careless or even innocent delay [could produce] sentencing consequences so unusual and unfair that a departure would be permissible" even if there is no deliberate delay on the part of the government.

### iii.  Legal Argument

Turning to our case, there is no doubt that the defendant was prejudiced in the instant matter based on the delay of the government.[3]  The defendant clearly missed a number of opportunities that he would have been afforded had there not been said delay.

First, as a result of the defendant's conviction on the Eastern District case, his criminal history category increased

---

[3] We want to be clear that we have no reason or basis to believe that the Department of Justice delayed the prosecution.  Upon information and belief the investigators of New York City Police Department led by Mahady, intentionally delayed the prosecution by delaying the arrest of Rizzi.

from a category II to a category III, thereby exposing him to an increase in his Sentencing Guideline range on the instant matter. In other words, had the defendant been convicted on the instant matter, under the same plea agreement, with Criminal History category II instead of III, his Sentencing Guideline range calculation would have been six to twelve months instead of eight to fourteen months.

Second, the defendant missed the opportunity to have his convictions grouped together for purposes of sentencing had both cases been heard together before the Honorable Judge Amon. As mentioned above in *Martinez*, supra, the Court recognized that there are instances where a delay in prosecution, whether deliberate or not, can prejudice the defendant by exposing him to harsher penalties since the defendant was not afforded the opportunity for a more lenient sentence based on a grouping analysis.

Third, the defendant missed the opportunity at being released on bail during the pendency of this case. There is no doubt had Rizzi been prosecuted, on the instant matter, at or around the same time that the Eastern District case was being prosecuted, he would have been afforded the opportunity to make bail and been freed during the pendency of the instant case.

Instead, because Rizzi began to serve his sentence on the

Eastern District case, a day before he was returned to the MDC to be arrested on the instant matter, there was no basis for bail.

Most importantly, because of the delay, Rizzi missed the opportunity, to serve his current sentence on the Eastern District case at FCI Loretto, where he was assigned and where he actually surrendered.  FCI Loretto is a low security correctional institution with an adjacent minimum-security satellite camp.  Instead, Rizzi was made to serve out the last year at the Metropolitan Detention Center, a maximum-security jail with conditions that are severe and harsh compared to FCI Loretto.

Which brings me to the timing of the arrest and subsequent prosecution, which at best "raises an eyebrow" and "raises the suspicion of bad motive on the part of the government."

As mentioned briefly above, the NYPD possessed the information and evidence on the instant case, either before or soon after Rizzi's arrest on May 25, 2016.  Rizzi was free on bail from May 26, 2016 until he surrendered at FCI Loretto on August 1, 2017.  During the time that the Eastern District case was pending, he lived at his home in Brooklyn.  The same home where he was arrested on the Eastern District case.  Moreover, Rizzi was reporting to pretrial services on a regular and

routine basis.  There is certainly no doubt that the NYPD could have arrested Rizzi at any point before August 1, 2017, before he surrendered.  Instead, the NYPD, for no apparent innocent reason, waited until he surrendered on August 1, 2017 to arrest him.

Based on the timing of the arrest and prosecution, coupled with the history of animosity between the defendant and the lead investigatory, Mahady, there appears to be, at least on a prima facie level, bad faith on the part of the New York City Police Department in causing the delay.  It appears that the timing in the instant matter is the exact circumstance the Court considered in *Los Santos*, supra, when it stated, "a rule requiring the defendant to show bad faith on the government's part would nearly always prove to be an insurmountable burden for the defendant, even in a case where the delay is extreme." There are instances where the timing of the prosecution raises the suspicion of bad faith.  This is one of those instances.

Finally, there are a number of other missed opportunities that are admittedly, speculative in nature, but real nonetheless.  For example, by delaying the prosecution the NYPD prevented the defendant the opportunity to resolve both cases together.  This could have resulted in no additional exposure above and beyond the guideline calculation that was agreed upon

on the Eastern District case.   The defendant also missed the opportunity to have defense counsel negotiate, and even perhaps, convince the United States Attorney's Office to drop the Conspiracy to Commit Bank Fraud in exchange for his plea on the original charge on the Eastern District case.

The delay further caused the defendant to miss the opportunity for Judge Amon to sentence the defendant on both convictions at the same time and quite possibly to the same sentence of fifteen months of incarceration followed by four months of home confinement, three years of supervised release and $1,000.00 fine, if she chose. Of course, it is quite possible that Judge Amon could have sentenced the defendant to an additional term of imprisonment or higher fine if both convictions were before her.


iv.  <u>Conclusion</u>

Based on the missed opportunities that the defendant incurred, as a result of the delay in arrest and prosecution, and in accordance with U.S.S.G §5G1.3(d), a sentence that does not cause Rizzi to serve any additional time of incarceration then his current sentence, would achieve a "reasonable punishment for the instant offense."

4. The Need to Avoid Unwarranted Sentencing Disparities

We respectfully submit that the sentence we are requesting of zero months or a guideline range sentence to run concurrent to Michael's current sentence of incarceration significantly reduces the risk of a sentencing disparity resulting from any sentence this Court chooses to impose.

5. The Need to Provide Restitution

Restitution in the amount of $28,000.00 will be provided.

## Conclusion

It is respectfully requested that the Court consider the foregoing; the attached Performance Rating; the attached photographs the attached letters of support from Michael's friends and family, and the attached letter of Michael Rizzi (Attached as Exhibit E) in imposing a sentence that does not inflict additional time to his undischarged term of imprisonment.

Respectfully Submitted,

Javier A. Solano, Esq.
*Attorney for Defendant*
*Michael Rizzi*
350 5th Avenue, Suite 5900
New York, New York 10118
Tel: 212.714.6600

## DECLARATION OF SERVICE

Javier A. Solano, declares under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

On January 5, 2018 I served the annexed Sentencing Memorandum on:

Louis Pelligrino, Esq.
Assistant United States Attorney
United States Attorney for the
Southern District of New York
One St. Andrew's Place
New York, New York 10007

Defense Counsel

[X]  BY ELECTRONIC CASE FILING
[X]  BY EMAIL
[ ]  BY HAND
[ ]  BY FIRST CLASS MAIL
[ ]  BY FACSIMILE WITH PERMISSION

Dated:    New York, New York
          July 10, 2018

\_\_\_\_\_/s/_____
JAVIER A. SOLANO, ESQ.
350 5th Avenue, Suite 5900
New York, New York 10118
212.714.6600